HOUSTON, Justice.
The plaintiff, James H. Hope III, appeals from a judgment for the defendants Morris Automotive, Inc., and SunTrust Bank, in this action seeking, among other things, to establish a superior security interest in certain collateral.[1] We affirm.
For a number of years, Hope owned and operated Service Auto Parts, Inc., a NAPA Genuine Auto Parts store in Opelika. Hope negotiated during the latter part of 1990 and the first few months of 1991 to sell his store to Sidney E. (Gene) Lambert. After Hope and Lambert had reached an oral agreement for the sale of Service Auto Parts, Lambert formed Performance Automotive, Inc., to acquire the assets of the store. On February 27, 1991, SunTrust Bank lent Performance Automotive $200,000 to finance its start-up costs. Lambert and his wife, Janice, personally guaranteed payment of that loan. In addition, SunTrust Bank obtained a security interest in substantially all of Performance *1236 Automotive’s assets, including all of the inventory and equipment that it owned or would thereafter acquire. On February 20, 1991, SunTrust Bank filed a financing statement with the secretary of state, pursuant to Ala.Code 1975, § 7-9-401(l)(c), to publicly record that it had taken a security interest in all of the inventory and equipment that Performance Automotive owned or would acquire in the future.
On March 4, 1991, Hope and Lambert reduced their oral agreement to writing. Performance Automotive purchased substantially all of the assets of Service Auto Parts, including all of the equipment and inventory. As partial payment, Performance Automotive executed a promissory note to Hope in the amount of $138,000. Lambert personally guaranteed payment of that note. Thus, as of March 4, 1991, SunTrust Bank’s security interest had attached to the inventory and equipment purchased by Performance Automotive, and it had become a perfected security interest under Alabama’s Uniform Commercial Code, Article 9 — “Secured Transactions” — Ala. Code 1975, § 7-9-101 et seq. See § 7-9-203 and § 7-9-303. Performance Automotive also granted Hope a security interest in the same collateral (equipment and inventory) that it had used to secure the loan from SunTrust Bank. Under its security agreement with Hope, Performance Automotive was required to maintain the store’s inventory level at no less than $330,000. Hope had the right under that agreement to declare Performance Automotive in default and to foreclose on the collateral in the event the inventory level fell below $330,000. On February 27, 1995, Hope filed a financing statement with the secretary of state, reflecting his security interest in Performance Automotive’s inventory and equipment.
Performance Automotive struggled financially, and in 1994 it began to reduce its inventory level. Although he had the right to question Performance Automotive’s declining inventory level, Hope never requested any documentation to verify that the inventory level was being maintained at or above $330,000. One of the reasons Hope faded to closely monitor the store’s inventory level was his erroneous belief that Lambert had enough personal assets to satisfy Performance Automotive’s indebtedness. By letter to Lambert dated April 27, 1994, Gregory Bell, an assistant vice president of SunTrust Bank, declared Performance Automotive in default, accelerated the bank’s note, and demanded full payment. On the same day he declared Performance Automotive to be in default, Bell, who specialized in loan transactions involving NAPA stores, mailed the following letter to Paul Scott, a NAPA representative in Atlanta, Georgia:
“Please accept this letter as your authority to act as agent for [SunTrust Bank] in connection with all matters relating to the repossession and subsequent disposition of collateral pledged by the borrower to [Sun-Trust Bank] in connection with the above-referenced loan.
“This appointment is only valid if the borrower is voluntarily relinquishing possession of the collateral to the Genuine Parts Company. This repossession must be completed without a breach of the peace or the violation of any applicable state or federal law.”
Bell testified as follows:
“Q. Now at the time the loan was accelerated and demanded, did you also send correspondence to NAPA?
“A. Yes.
“Q. Okay. And what document are you looking at there?
“A. This is the standard letter that also goes out with our demand and acceleration letters. When we have a problem loan in the program and we deem it necessary, or excuse me, when we have a loan in default and we deem it necessary to make demand on that borrower we of course send the demand and acceleration note to the borrower and the guarantors. Along with that we will also send out this particular letter to Genuine Parts which appoints them as an agent to repossess the collateral. This particular letter that you have given me right here is that agency letter which was addressed to Mr. Paul Scott at NAPA and was sent out at the same time, is dated and was sent out at the same time as the acceleration letter. This authorizes *1237 him to repossess, to act as the bank’s agent to repossess the collateral of Performance Automotive.
[[Image here]]
“Q. Now backing up for just a moment, what, upon default, what were the bank’s options in regards to Lambert and Performance [Automotive]?
“A. Obviously we had the right because he was in default to make demand under the note and the security agreements for payment in full. That can be draconian and it’s not always in everybody’s best interest for the bank to immediately step out and try to seize the assets of a business. It may not be in the bank’s best interest and it more than likely is not in the borrower’s best interest. In this particular case after discussions with Gene, Gene had indicated that he was talking with another financial institution, possibly more, and that he was going to try to secure additional financing to take us out, plus get additional moneys for the business. That was after we had sent the demand letter. I felt like what the bank was looking for was to get paid back in full on its loan and we didn’t want to preempt Gene from trying to do just that if he wanted to continue [in] the business. So we didn’t want to necessarily put him out of business.
“Q. Now, what was meant to be accomplished by having NAPA in charge as agent for the bank?
“A. Generally we were looking to them to repossess the collateral if necessary, if it came down to it and if Gene could not secure the financing in a reasonable period of time we were looking to go in and repossess the collateral and dispose of it.
“Q. And what was the, in regards to maximizing the return on this collateral, what was the best way to do it?
“A. Typically if we have to go in and this is standard for the NAPA program in general realizing that we were lending all across the United States, if we asked Genuine Parts to go in and do, strictly foreclose on the collateral, pick it up and repossess it, they will generally give us seventy five cents on the dollar for those assets. If we can, as another option, sell those assets to an existing operator you can generally get a hundred cents on the dollar for those assets, thereby maximizing the value of the business to both the owner and to the bank and to other secured and unsecured creditors. It’s the preferred choice if we can do it in these types of disposition is to sell to an existing operator and that’s what we chose to do in this case [sic]. Paul Scott was able to come to the Morrises, they were willing parties and we proceeded along those lines.
“Q. So in your mind this sale to a subsequent operator was the best way to maximize the [return on the] collateral?
“A. Absolutely.”
After it had notified Performance Automotive that it was in default, the bank continued to work with Lambert in an attempt to avoid having to seize the collateral and conduct a forced sale that, according to Bell, would have resulted in a return of only approximately 75 cents on the dollar. As noted, SunTrust Bank concluded that the better approach would be to have its collateral disposed of by a private sale of the store to a new operator as a going concern.
In the fall of 1994, as Performance Automotive’s inventory level continued to decline, NAPA Genuine Auto Parts informed Lambert that he had to sell his store or else NAPA would have to find another operator for Opelika. NAPA put Lambert in touch with Morris Automotive, Inc., which operated NAPA stores in Alabama and Georgia. Morris Automotive and Lambert eventually came to terms on a buy-out. The agreement called for Morris Automotive to take over operation of the Opelika store, with the purchase price set as the value of the store’s inventory at a wholesale price (i.e., at the price NAPA would charge its operators), plus a fixed price for the furniture, fixtures, and equipment. The fairness of the valuation of Performance Automotive’s inventory and equipment is not questioned. The agreement further specified, in accordance with instructions fi-om NAPA, that Morris Automotive would make joint payment of the proceeds to Lambert and SunTrust Bank. *1238 SunTrust Bank, which, the parties agree, held a perfected security interest in Performance Automotive’s inventory and equipment, and which approved of the sale of the store to Morris Automotive, was entitled to, and received, all of the money generated by the sale to Morris Automotive.
Hope had become aware of Lambert’s negotiations with Morris Automotive before the sale of Performance Automotive was closed and Morris Automotive took over the operation of the store on February 14, 1995, and he made every effort to notify Morris Automotive, Lambert, and the bank of his security interest and his desire to be paid out of the proceeds of the sale. When Morris Automotive took possession of Performance Automotive’s assets, Performance Automotive owed SunTrust Bank $149,017 and Hope approximately $125,000. Morris Automotive financed its purchase of Performance Automotive through SunTrust Bank. Morris Automotive executed an agreement on February 9, 1995, granting a security interest in all of the Opelika store’s inventory and equipment to SunTrust Bank. Upon execution of this agreement, SunTrust Bank orally committed to lend Morris Automotive sufficient money to finance its purchase of the store. SunTrust Bank filed a financing statement with the secretary of state on February 17, 1995, reflecting its security interest in the inventory and equipment of Morris Automotive’s Opelika store. Morris Automotive executed a promissory note to SunTrust Bank on March 21, 1995, and the bank released the loan proceeds on that same day. SunTrust Bank agreed with the Lamberts to accept the proceeds of the sale of the store to Morris Automotive, plus any additional accounts receivable from Performance Automotive, in full satisfaction of Performance Automotive’s outstanding debt. The bank released the Lamberts from their personal guarantees. As previously noted, all of the proceeds of the sale of Performance Automotive to Morris Automotive went to SunTrust Bank. After collecting only a few thousand dollars of Performance Automotive’s accounts receivable, the bank declared a loss on its loan to Performance Automotive.
Hope filed this action, naming as defendants Performance Automotive, Lambert, Morris Automotive, and SunTrust Bank. The first count in the complaint alleged that Performance Automotive and Lambert had defaulted under the terms of the promissory note executed by Performance Automotive and the personal guarantee executed by Lambert, respectively. The second and fourth counts sought to establish that Hope retained a security interest in the Opelika store’s inventory and equipment after its sale to Morris Automotive and that that security interest had priority over the security interest held by SunTrust Bank. The third count stated a claim in detinue. Following a nonju-ry trial, the judge, who had heard ore tenus evidence, entered a $166,759.06 judgment for Hope against Performance Automotive and Lambert. Performance Automotive and Lambert did not appeal that judgment. However, the trial judge held that Hope did not have an enforceable security interest in the store’s inventory and equipment; therefore, he entered a judgment for Morris Automotive and SunTrust Bank. The trial judge found it significant that the value of the inventory and equipment owned by Performance Automotive was inadequate to satisfy Performance Automotive’s indebtedness to the bank and that no funds were available to satisfy Performance Automotive’s indebtedness to Hope, whose security interest, the judge held, was subordinate to that of the bank’s.
Hope contends that Performance Automotive’s sale of the Opelika store to Morris Automotive was a bulk transfer of goods under Article 6 of Alabama’s version of the Uniform Commercial Code.[2] Relying on Ala. Code 1975, § 7-9-301(l)(c), he argues that Morris Automotive was not a buyer in the ordinary course of business and that it was aware of his security interest when it purchased the store from Performance Automo *1239 tive; therefore, he maintains, his rights in the store’s inventory and equipment are superior to those of Morris Automotive. Relying on § 7-6-105 and § 7-6-107, Hope also argues that Morris Automotive failed to give him sufficient notice of the transfer of the inventory and equipment and that, as a result, the transfer was ineffective as to him. Hope contends that he was entitled to a judgment in the amount of the fair market value of the store’s inventory and equipment that was transferred to Morris Automotive.
Morris Automotive and SunTrust Bank contend, among other things, that the sale of the inventory and equipment from Performance Automotive to Morris Automotive was a disposition of collateral in settlement or realization of the bank’s security interest. Relying on Ala.Code 1975, § 7-6-103, they argue that the sale was not subject to the article dealing with bulk transfers. Relying on § 7-9-504, they argue, instead, that the bank forced a disposition of the inventory and equipment through a private sale to Morris Automotive and that that sale operated to discharge Hope’s subordinate security interest. Hope contends that Lambert, not the bank, sold or disposed of the inventory and equipment through a private sale to Morris Automotive and, therefore, that § 7-9-504 is not applicable. According to Hope, his security interest remained effective after the transfer of the inventory and equipment from Performance Automotive to Morris Automotive and that it was superior to the bank’s because he filed his financing statement with the secretary of state on February 27, 1995, before Morris Automotive executed its promissory note to the bank on March 21, 1995. Hope contends that the bank’s filing of its financing statement on February 17, 1995, was óf no effect, because, he says, the bank’s security interest could not attach until the bank had given value for the security interest and the bank did not give value until it actually lent the money to Morris Automotive on March 21, 1995. Therefore, according to Hope, the bank’s security interest was not perfected until March 21, 1995. The bank counters this argument by contending that its security interest in Morris Automotive’s inventory and equipment was actually perfected on February 9, 1995 (before Hope filed his financing statement on February 27, 1995), by virtue of its security agreement with Morris Automotive and its oral commitment to lend Morris Automotive the money to finance its purchase of the store. In support of this argument, the bank cites § 7-9-301(2), which provides that “[i]f the secured party files with respect to a purchase money security interest before or within 20 days after the debtor receives possession of the collateral, he takes priority over the rights of a transferee in bulk or of a lien creditor which arise between the time the security interest attaches and the time of filing.”
Section 7-6-103 provided in part as follows:
“The following transfers are not subject to this article:
[[Image here]]
“(3) Transfers in settlement or realization of a claim or other security interest. ...”
Section 7-9-504 provides in pertinent part:
“(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing....
[[Image here]]
“(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor....
“(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor’s rights therein, discharges the se *1240 curity interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this part or of any judicial proceedings:
“(a) In the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or
“(b) In any other case, if the purchaser acts in good faith.”
We note at this point that it is undisputed that SunTrust Bank’s security interest was superior to Hope’s security interest at the time of the sale of the inventory and equipment to Morris Automotive. Therefore, if the sale of the inventory and equipment to Morris Automotive was a “disposition of collateral” by the bank, within the meaning of § 7-9-504, then the transaction was not governed by the law on bulk transfers and the sale discharged Hope’s security interest.
Pursuant to § 7-6-103(3), “transfers in settlement or realization of a lien or other security interest” were not subject to the regulations set out in Article 6 governing bulk transfers. The terms “settlement” and “realization” were not specifically defined in the Code. A “transfer in settlement” may have referred to a secured party’s election to accept collateral in discharge of a secured obligation under § 7-9-505(2). A “transfer in realization” logically referred to a transfer by a secured party, in foreclosure of a security interest under § 7-9-504. In any event, although there are no Alabama cases on point, courts in other jurisdictions have held that the kind of disposition that took place in the present case was exempt from Article 6 because it was deemed either a “transfer in settlement” or a “transfer in realization” of a security interest, or the equivalent thereof. See Techsonic Industries, Inc. v. Barney’s Bassin’ Shop, Inc., 621 S.W.2d 332, 334 (Mo.App.1981), wherein the Missouri Court of Appeals, interpreting a provision identical to § 7-6-103(3), stated:
“Plaintiff contends, quoting from Starman v. John Wolfe, Inc., 490 S.W.2d 377, 382 (Mo.App.1973), that to ‘be an exempt transfer under § 400.6-103(3) the transfer should be made to the holder of the security interest and not to the transferee for the benefit of the secured holder.’ The quoted language does appear favorable to plaintiff but the facts in Starman are significantly different from those here. In the same paragraph as that quote the opinion states that there was no evidence that the debtor was in default under any security agreement nor that the secured party had a right to foreclose or demand delivery of the goods at the time of the transfer. Here there was a default in the agreement and the bank had a right to possession and was preparing to foreclose and seize the inventory. The sale was subject to the approval of the bank and all proceeds went to the bank. In Starman the bank did not receive the entire consideration ‘so that some creditors were preferred over Starman to his detriment.’ 490 S.W.2d at 383.
“The wording of § 400.6-103(3) does not require that the transfer be made to the holder of the security interest. We agree with American Metal Finishers, Inc. v. Palleschi 55 A.D.2d 499, 391 N.Y.S.2d 170 (1977), that we should not add a requirement that the transferee must be the holder of the security interest. As that case stated, if there was a transfer to the security holder and the security holder then sold the goods, the creditors could not complain and there is no reason to require two transactions rather than one when the transaction was made with the approval of the secured party and to satisfy the lien. We hold that the transfer here is exempt and because of the difference in facts, do not believe that this result conflicts with the Starman holding.”
Reviewing a transaction similar to the one that took place in the present case, the Arkansas Court of Appeals, in Ouachita Electric Cooperative Corp. v. Evans-St. Clair, 12 Ark.App. 171, 176-77, 672 S.W.2d 660, 663-64 (1984), noted:
“In American Metal Finishers, Inc. v. Palleschi 55 App. Div.2d 499, 391 N.Y.S.2d 170, 20 U.C.C. Rept. Ser. 1283 *1241 (1977), the plaintiff complained that the transfer would not qualify under U.C.C. § 6-103(8) because the property transfer was made to a third person who assumed the indebtedness of the transferor with a secured creditor who held a security interest in the property transferred. The New York court disagreed, stating as follows [at 55 App. Div. 501, 391 N.Y.S.2d at 171-72]:
“‘The chief rationale of the Bulk Transfers article is the avoidance of the “major bulk sales risk” of “[t]he merchant, owing debts, who sells out his stock in trade ..., pockets the proceeds, and disappears leaving his creditors unpaid” [citations omitted]. But where the transfer is in settlement of a lien or security interest, there are [no] cash proceeds with which the seller could abscond. Thus, where the consideration is settlement of an indebtedness with no receipt of cash proceeds, the protective purposes of the Bulk Transfers article do not apply.
‘“We see no reason to read subdivision (3) of section 6-103 of the Uniform Commercial Code so restrictively as to add a requirement that the transferee must be the holder of the security interest, thus ruling out transfer to one who in good faith takes over the position of the security holder. The interposition of such new party is not that of an officious volunteer; it serves a socially beneficial purpose of avoidance of foreclosure, with its concomitant hardships to creditors, employees and the commercial community.’”
See, also, River City Products, Inc. v. AEJ, Inc., 774 S.W.2d 452 (Ky.App.1989); Annotation, What Constitutes ‘Transfers in Settlement or Realization of a Lien or Other Security Interest’ Within UCC § 6-103(3) of Bulk Sales Transfer Act, 86 A.L.R.4th 1104 (1991). The rationale of these cases is persuasive. Like the New York, Missouri, and Arkansas courts, we see no reason to read § 7-6-103(3) so restrictively as to add a requirement that the transferee must be the holder of the security interest, thus ruling out a transfer of the collateral to a good faith purchaser. Therefore, we hold that the sale of the inventory and equipment from Performance Automotive to Morris Automotive was a transfer of collateral in settlement or realization of the bank’s security interest. As such, it was not gpverned by § 7-6-103.[3] We conclude, instead, that it was governed by § 7-9-504, as a “disposition” of collateral by the bank following Performance Automotive’s default. We hold, therefore, that Hope’s subordinate security interest was discharged pursuant to § 7-9-504(4).
We note that Hope disputes the contention of Morris Automotive and SunTrust Bank that the bank sold or otherwise disposed of the collateral. Hope focuses on the fact that the bank did not physically repossess the collateral and sell it to Morris Automotive. The record indicates that Lambert negotiated with representatives of Morris Automotive for the sale of his store and that the bank did not participate directly in that *1242 sale. However, although the bank was certainly entitled under § 7-9-503 to physically repossess the collateral and to sell it to Morris Automotive directly, there is no indication in § 7-9-504 that the bank was necessarily restricted to that method of. disposition. See R. Anderson, 9A Uniform Commercial Code, § 9-504:48 (3d ed. 1994) (“The Code does not require that the creditor actually repossess the collateral before making a foreclosure sale”). Furthermore, § 7-9-504(1) provides that “[a] secured party after default may sell ... or otherwise dispose of any or all of the collateral.” (Emphasis added.) Logically, therefore, a secured party after default may “otherwise dispose” of collateral without taking physical possession of it. Section 7-9-504(3) goes on to provide that “[s]ale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.” (Emphasis added.) The record indicates that SunTrust Bank appointed NAPA as its agent either' to repossess the collateral from Performance Automotive, if that proved necessary, or to find a buyer for the store. There is no question that Performance Automotive was in default at the time of that appointment and that the bank, having a priority security interest, had the right to dispose of the collateral in an attempt to satisfy Performance Automotive’s debt, provided that the disposition was done in a commercially reasonable manner and provided Lambert was given “reasonable notification of the time after which any private sale or other intended disposition [was] to be made.” Section 7-9-504(3). NAPA, acting on the bank’s behalf, required Lambert to enter negotiations with representatives of Morris Automotive. Although Lambert and Morris Automotive ultimately agreed between themselves and completed the sale of the store, the record clearly indicates that the driving forces behind that transaction were SunTrust Bank and NAPA. It is undisputed that Morris Automotive negotiated with Lambert ip good faith and that the evaluation and sale of the collateral were commercially reasonable. Hope concedes this. It also goes without saying that the notice requirement of § 7-9-504(3) was satisfied, inasmuch as Lambert was involved in the negotiations and in the sale of his business, from the beginning to the end. True, the bank’s method of disposition was not a conventional foreclosure, in that it did not involve its taking physical possession of the collateral and directly selling the collateral to Morris Automotive; however, the bank did accomplish its goal (and the goal of § 7-9-504) of maximizing the return on the sale of the collateral through a commercially reasonable manner of disposition.[4] The trial judge correctly recognized that there was not even sufficient collateral to satisfy Performance Automotive’s indebtedness to SunTrust Bank, the primary secured party, much less to satisfy Performance Automotive’s indebtedness to Hope. However, the bank’s method of disposition gave Hope the best possible chance for a recovery under his security interest. The root cause of Hope’s loss appears to be Lambert’s failure to maintain his store’s inventory level at or above $330,000, as he had agreed to do when he bought Hope’s store. Although we most certainly understand Hope’s desire to undo what has *1243 been done, we conclude that it would elevate form over substance and thereby unduly restrict the commercially reasonable methods of disposition of collateral contemplated by § 7-9-504 for us to hold as Hope suggests, i.e., that the sale of Performance Automotive to Morris Automotive did not involve a disposition of collateral by the bank.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, KENNEDY, and SEE, JJ., concur.
COOK, J., concurs in the result.
BUTTS, J., dissents.

. Performance Automotive did not appeal from the judgment against it.

. Article 6 (Ala.Code 1975, §§ 7-6-101 through 7-6-111) was repealed by the Legislature effective May 17, 1996, after the date of the transaction made the basis of this action. See Ala. Acts 1996, No. 96-523, p. 677, § 1. For a good discussion of the events leading up to the repeal of Article 6, see 6C W. Hawkland, U.C.C. Series (Revised Article 6 — Bulk Sales) (1993).

. As previously noted in n. 1, Article 6 was repealed by the Legislature in 1996. This repeal was precipitated, it seems, hy the recommendations of the National Conference of Commissioners on Uniform State Laws and the American Law Institute. Both the Conference and the Institute encouraged those states that had enacted Article 6 to repeal it. However, for those states that were not inclined to repeal their Article 6, the Conference and the Institute promulgated a revised version of Article 6. The revised Article was designed to afford better protection to creditors while minimizing the impediments to good faith transactions. See “Prefatory Note,” U.C.C. Series (Revised Article 6 — Bulk Sales), supra, n. 1. Revised § 6-103(3) would provide, in part:
"This Articles does not apply to:
[[Image here]]
"a sale of an asset encumbered by a security interest or lien if (i) all the proceeds of the sale are applied in partial or total satisfaction of the debt secured by the security interest or lien....”
This new exclusion specifically recognizes what the courts were already holding — that although payment of a secured obligation is not necessarily the result of a foreclosure and repossession of the collateral, it, in and of itself, should be put outside the scope of Article 6, whether accomplished directly or accomplished indirectly. This exclusion does not require that the transfer be made directly to the holder of the security interest, but where the transfer is made to a third person all the proceeds must be applied by the third party or debtor in partial or full satisfaction of the secured obligation. U.C.C. Series (Revised Article 6 — Bulk Sales), supra, § 6-103:10.

. The "Official Comment” to § 7-9-504 states in part:
"1. The Uniform Trust Receipts Act provides that an entruster in possession after default holds the collateral with the rights and duties of a pledgee, and, in particular, that he may sell such collateral at public or private sale with a right to claim deficiency and a duly to account for any surplus. The Uniform Conditional Sales Act insisted on a sale at public auction with elaborate provisions for the giving of notice of sale. This section follows the more liberal provisions of the Trust Receipts Act. Although public sale is recognized, it is hoped that private sale will be encouraged where, as is frequently the case, private sale through commercial channels will result in higher realization on collateral for the benefit of all parties. The only restriction placed on the secured party’s method of disposition is that it must be commercially reasonable. In this respect this section follows the provisions of the section on resale by a seller following a buyer’s rejection of goods (Section 7-2-706). Subsection (I) does not restrict disposition to sale: the collateral may be sold, leased, or otherwise disposed of— subject of course to the general requirement of subsection (2) that all aspects of the disposition be ‘commercially reasonable
(Emphasis added.)